# EXHIBIT A

STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS                                          SUPERIOR COURT

Julie Keiran
6A Hovey Road
Londonderry, NH 03053

v.

Rent-A-Center East, Inc.
5501 Headquarters Drive
Plano, TX 75024

AND

Michael Palermo
c/o Rent-A-Center East, Inc.
1653 Middlesex Street
Lowell, MA 01851

Case # 218-2020-CV-00126

**COMPLAINT AND REQUEST FOR JURY TRIAL**

NOW COMES Plaintiff, Julie Keiran, by and through her attorney, Law Office of Leslie H. Johnson, PLLC, and complains against Rent-A-Center East, Inc. and Michael Palermo, Defendants, and in support thereof states as follows:

1. **Julie Keiran (hereinafter "Ms. Keiran" or "Plaintiff") requests a trial by jury**.

2. Ms. Keiran, a female, brings this action pursuant to the statutory and common laws of the State of New Hampshire, particularly New Hampshire's law against discrimination, NH RSA 354-A, et seq., including for gender discrimination/termination, hostile environment and retaliation, and for disability discrimination/termination and failure to accommodate which are also contrary to Title VII and the Americans with Disabilities Act (ADA), 42 USC §12101, et

1

seq., as amended, including the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (ADAAA" or "amended Act"), respectively. Ms. Keiran asserts, and requests, equitable relief and all damages as allowed by law under NH RSA 354-A, et seq.

## PARTIES

3. Plaintiff, Julie Keiran a female citizen of the United States of America, with an address of 6A Hovey Road, Londonderry, County of Rockingham, State of New Hampshire 03053, was employed by Defendant RAC from on or about 06/26/16 until on or about 06/23/17. Ms. Keiran was pregnant during work for Defendant and delivered her child on 08/21/17. Ms. Keiran was a qualified person with a temporary disability.

4. Rent-A-Center East, Inc. (hereinafter "Defendant RAC"), is a foreign corporation doing business in New Hampshire, with a principal office address of 5501 Headquarters Drive, Plano, TX 75024. The Rent-A-Center locations where Ms. Keiran worked are located at 490 Valley Street, Manchester, NH 03103 and 50 Storrs Street, Concord, NH 03301. Its Registered Agent is CT Corporation System, 2 1/2 Beacon Street, Concord, NH 03301. Defendant RAC has at least several hundred, if not thousands, of employees across the country.

5. Michael Palermo (hereinafter "Defendant Palermo"), a male, is the District Manager of Defendant RAC. Defendant Palermo's address is unknown to Ms. Keiran, therefore, alternatively, his Rent-A-Center primary address is 1653 Middlesex Street, Lowell MA 01851. Defendant Palermo aided and abetted Defendant RAC in committing discrimination, harassment and creating a hostile, intimidating and offensive work environment for Ms. Keiran which affected the terms, conditions and privileges of her employment. Defendant Palermo also retaliated against Ms. Keiran by harassing her and firing her, on the basis of her complaints concerning her treatment and requests for accommodations based on pregnancy/gender and

disability.

## VENUE AND JURISDICTION

6. On or about 12/05/17, Ms. Keiran filed a timely Charge of Discrimination with the New Hampshire Commission for Human Rights, being Charge #16D-2018-00072. Ms. Keiran removed her Charge on or about 12/31/18 which closed their case. Ms. Keiran also gave notice to the EEOC that she was removing her case and filing suit. A Notice of Right to Sue was issued on October 31, 2019 and received on November 4, 2019, and this suit is filed within 90 days of receipt thereof.

7. Venue and jurisdiction are proper as Ms. Keiran worked for Defendants at the Rent-A-Center locations at 490 Valley Street, Manchester, NH 03103, and 50 Storrs Street, Concord, NH 03301, but lived in Rockingham County at the time of the incidents complained of herein.

## STATEMENT OF FACTS

8. Ms. Keiran was employed by Defendant RAC from approximately 06/26/16 until on or about 06/23/17.

9. Ms. Keiran was hired as a Manager in Training ("MIT") assigned to Store 532 located at 490 Valley Street in Manchester NH, where she was to be trained while she worked. As a MIT, Ms. Keiran was supposed to be trained for a minimum of 6-8 months, which included a four-step process, each step signed by the store manager training her as the step was completed. Once all four steps were successfully completed and signed off by the training store manager, Ms. Keiran would become a Store Manager.

10. On or about 11/12/16, Ms. Keiran was asked by Defendant Palermo, her District Manager, to help out at Store 1826 located at 50 Storrs Street, Concord NH, for a few weeks,

which she gladly did.

11.     On or about 11/29/16, Ms. Keiran was offered the Store Manager position at Store 1826 by Defendant Palermo, even though she had not completed her training. Defendant Palermo informed Ms. Keiran the position came with an annual salary of $50,000.00 based on 50+ hours per week, and Ms. Keiran accepted the position.

12.     Ms. Keiran's training was supposed to be completed prior to her promotion; however, due to Store 532 being so busy and understaffed, the store training manager, Tammy Quinones-Davila, only had time to train Ms. Keiran through Step 1. Defendant Palermo was supposed to sign off that Step 1 (called Red Star Training) was completed, but he never did. Defendant Palermo was very aware of where Ms. Keiran was in her training, only having completed Step 1 of 4 steps, and told Ms. Keiran that he was not worried about it, that this was a big step for her career and that Defendant RAC would eventually get to the rest of her training, however, he provided no timeline.

13.     On or about 11/29/16, Ms. Keiran became Store Manager of Store 1826. She was expected to work 6 days per week, including Saturdays from 7 AM to 7:30 PM or 8 PM with 30 minutes for lunch. Some weeks, Ms. Keiran did not have a day off, if the store numbers were not what Defendant Palermo wanted or he wanted her to work.

14.     On or about 02/24/17, Ms. Keiran called Defendant Palermo and told him she was pregnant with a due date of 08/19/17. Defendant Palermo showed little reaction; however, he put a huge push on getting Ms. Keiran's employees trained properly and ready to handle the store while she was out on maternity leave. Ms. Keiran asked about her training; and, again, Defendant Palermo told her not to worry about it, that he needed her staff trained first and to call him with any questions.  Ms. Keiran believes Palermo refused to train her because she was

pregnant.

15. Once promoted to Store Manager, and after learning Ms. Keiran was pregnant, Defendant Palermo began to belittle and yell at Ms. Keiran daily. Defendant Palermo would end most phone calls with Ms. Keiran by yelling, swearing, and hanging up on her. Even during group conference calls with various store managers, Defendant Palermo would yell, belittle and hang up. By way of example, which is not all-inclusive, Defendant Palermo made the following comments:

    a. Defendant Palermo would ask Ms. Keiran a question such as, "Why aren't your sales numbers up?" If he wasn't happy with her answer, he would say, "That's such bullshit Julie. You're half-assing the calls obviously. Call me back when you have results," and hung up on her;

    b. Defendant Palermo often said, "Don't give me that shit" during one-on-one phone conversations, or when he pulled Ms. Keiran out back in her store to yell at her and her employees could hear him yelling;

    c. Defendant Palermo consistently used the word "bullshit" and occasionally the word "fuck," when he was worked up;

    d. Defendant Palermo often said things like, "You have two ears and one mouth. You need to shut one and open the other two," which was belittling; and

    e. Defendant Palermo frequently asked if she knew how to read English, if she had a hearing problem, "Do you even listen when people talk? Did you go to school as a kid?"

16. Due to the stress, Ms. Keiran was experiencing from the harassment she received nearly daily from Defendant Palermo and the long hours, she was taken to the emergency room

on several occasions, including for treatment of anxiety, stress, bleeding (placenta detaching), and premature contractions. Ms. Keiran made Defendant Palermo aware of each medical visit and that stress from work was the cause. Defendant Palermo would then tell Ms. Keiran, "Then don't stress. It's that simple."

17. On or about 05/02/17, due to multiple emergency room visits caused by stress from work, which stress caused various physical reactions, including but not limited to full body hives, high anxiety, panic attacks, and bleeding, Ms. Keiran's doctor wrote a note stating she should not work more than 40 hours per week. Ms. Keiran told Defendant Palermo and he made a 40-hour schedule for her which she adhered to.

18. On or about 06/14/17, after another emergency room visit due to stress at work, symptoms which included full body hives, and premature contractions, Ms. Keiran's doctor wrote another note further reducing her hours to 6 per day with a 30 hour per week maximum. Ms. Keiran was repeatedly warned that if she did not slow down, or her stress at work was not lessened, she would be pulled from work all together. Needing her income, Ms. Keiran was unable to just leave work and should not have had to do so.

19. On or about 06/15/17, when Ms. Keiran was approximately 7 months pregnant, she called Defendant Palermo to tell him about the results of her 06/14/17 doctor appointment and the note her doctor gave her further reducing her hours. Before Ms. Keiran could inform Defendant Palermo of the note, he started belittling her, including yelling and swearing at her about the store schedule and store numbers, which actually were the best they had been in a year. Defendant Palermo then hung up on Ms. Keiran.

20. Due to Defendant Palermo's inappropriate harassing behavior, Ms. Keiran burst into tears in front of her employees and customers. Ms. Keiran waited until she was able to calm

down and then sent Defendant Palermo a text message informing him of her doctor note and sending him a picture text of the note. Defendant Palermo's response was, "I will address this with John [Regional Manager]…I will get back to you later today or tomorrow morning."

21. Defendant Palermo called Ms. Keiran later that day and said he had no choice but to honor the doctor's note and that he would make a schedule accommodating her and have it to Ms. Keiran by the next day. In addition, Defendant Palermo told Ms. Keiran, "Unfortunately, I can't demote you or pay you hourly instead," and that he could not send another manager to assist her.

22. Defendant Palermo's response and comments, especially the fact Defendant Palermo wanted to demote her and cut her pay, upset Ms. Keiran. In addition, Defendant Palermo instructed Ms. Keiran to work every day to get every employee trained; however, regarding Ms. Keiran's training, he stated that would not be done until "after the baby."

23. Defendant Palermo expected Ms. Keiran to continue to work 10-13 hours per day contrary to her doctor note limiting her to 6 hours per day/30 hours per week. While Ms. Keiran waited for Defendant Palermo's response, she worked a full 10-hour day on 06/15/17.

24. In the meantime, Defendant Palermo refused to answer any of Ms. Keiran's phone calls; and, the few times he called her store, he asked for sales numbers from the staff member answering the phone and then hung up without ever speaking to Ms. Keiran. In the past, Defendant Palermo usually asked for Ms. Keiran since informing him of the numbers was part of her job as Store Manager, and he rarely spoke to her employees.

25. Due to Defendant Palermo's refusal to take or return Ms. Keiran's calls, on or about 06/16/17, Ms. Keiran called the Human Resource Department ("HR") to speak to someone about her doctor's note. HR referred Ms. Keiran to Jose in Defendant RAC's legal department.

When Ms. Keiran spoke with Jose and explained that she had a doctor's note and that she was unsure of what to do because her doctor was instructing her to not work more than 6 hours a day, but that Defendant Palermo was expecting her to work 10-13 hours per day, Jose asked Ms. Keiran to fax the doctor's note to him and he would handle the matter and contact Defendant Palermo. Ms. Keiran faxed the note to Jose as instructed.

26. At approximately 3 PM on 06/16/17, Defendant Palermo called Ms. Keiran, told her he was extremely upset that she had contacted corporate, and they could not accommodate her. Defendant Palermo told her effective immediately she was being placed on "forcible maternity leave," that she needed to pack all her belongings, hand over her codes and keys and be escorted out by Jimmy Wakefield, a MIT.

27. Ms. Keiran told Defendant Palermo that she had never heard of forcible maternity leave and asked if her short term disability would cover something like that. Defendant Palermo retorted, "It's none of my concern," and instead repeated that Defendant RAC could not accommodate her; could not demote her; could not put her on an hourly wage because managers are paid salary; and, therefore, they had no choice but to send Ms. Keiran home until after the birth of her child.

28. At approximately 3:15 PM, Ms. Keiran sent a text message to Defendant Palermo and asked him to at least allow her to work until 06/26/17, her one-year anniversary with Defendant RAC. Defendant Palermo sent a reply text, "Sorry, spoke to John and we are unable to do that," meaning they would not accommodate her.

29. At approximately 4 PM, Ms. Keiran called Jose and told him what had just transpired. Jose advised Ms. Keiran to call their disability carrier immediately as he did not know anything about forced maternity leave. In addition, Jose informed Ms. Keiran that he would

8

contact a few people and then speak with Defendant Palermo, but that until further notice she was to do as Defendant Palermo had instructed and go home.

30. Ms. Keiran then called the disability carrier and opened a short-term disability claim. The carrier informed Ms. Keiran that if her employer placed her on maternity leave without a doctor's note placing her out of work, she would most likely be denied.

31. At approximately 5 PM, Ms. Keiran finished packing all her belongings, handed over all items as requested, and was escorted out of the building.

32. Ms. Keiran was to have worked 06/17/17, 06/19/17 and 06/20/17 as her regular schedule before she was placed on forced maternity leave.

33. On or about 06/19/17, Defendant Palermo arrived at the store; and, according to staff, ripped apart Ms. Keiran's office searching through her drawers, paperwork, files, etc. Defendant Palermo then proceeded to ask staff questions, attempting to see what, if anything, Ms. Keiran had done to break the rules. It was obvious Defendant Palermo was trying to find something to justify firing Ms. Keiran. In fact, Defendant Palermo told two employees, E. Dionne and T. Handt, regarding Ms. Keiran, "She won't be with the company much longer." Defendant Palermo told another employee, J. Wakefield, that the store would be open for a Store Manager position shortly and to "sit tight," meaning this individual would be the next Store Manager and replace Ms. Keiran.

34. On 06/20/17, Ms. Keiran was supposed to work. After learning from the staff what Defendant Palermo had done, on or about 06/20/17, Ms. Keiran called Jose and left a message. Shortly thereafter, Jose returned the call and asked Ms. Keiran why she wasn't at work; informed her that Defendant RAC could "absolutely accommodate" her; that Defendant Palermo made a huge mistake; and, to return to work immediately.

35. Jose further informed Ms. Keiran that he spoke to Defendant Palermo first thing on Monday, 06/19/17, and instructed him to reinstate Ms. Keiran immediately. Ms. Keiran told Jose she had not received any calls or text messages from Defendant Palermo and that she had been out of work for 4 days on forced maternity leave. Jose instructed her to call Defendant Palermo immediately.

36. Ms. Keiran called Defendant Palermo immediately, however, he did not answer her call. Instead, approximately 20 minutes later at 10:33 AM, Defendant Palermo sent Ms. Keiran a text message stating, "Not sure if you got my message. Call me when you get time. HR approved the 30 HR schedule." Ms. Keiran had not received a prior message from Defendant Palermo, and she felt confident Defendant Palermo intentionally never sent a text message until after Jose called him informing him of Ms. Keiran's call.

37. Immediately after receiving Defendant Palermo's 10:33 AM text message, Ms. Keiran called him. Defendant Palermo told Ms. Keiran she could come back to work the next day, 06/21/17, however, if she did not want to be docked days or hours that she missed, she must work 30 hours in the next 3 days to ensure a full paycheck. This was contrary to Ms. Keiran's doctor note; and, therefore, her accommodation, and she informed Defendant Palermo of this. Defendant Palermo told Ms. Keiran the store was suffering because of her absence, and if she refused to work the 30 hours in 3 days then "just don't come back at all." Again, Defendant Palermo told Ms. Keiran how unhappy he was that she went over his head and called corporate on him, and informed her that he was at his wits end with her.

38. Due to the continued threat of losing her job, Ms. Keiran went back to work, believing she would have to work 30 hours in 3 days, putting the life and health of her and the baby at risk.

39. On or about 06/21/17, Ms. Keiran reported to work, but called both HR and Jose in Legal. Jose instructed Ms. Keiran to work no more than 6 hours, stating, "I don't know what is wrong with your district manager, your doctor note is written in plain English. I will talk to him again. If you have any further issues with your district manager contact me immediately."

40. HR returned Ms. Keiran's call and confirmed she was to work 30 hours at 6 hours per day and would receive her normal salary rate.

41. Ms. Keiran then sent a text at 1:27 PM to Defendant Palermo telling him that corporate confirmed she could not work over 6 hours per day.

42. On or about noon on 06/23/17, Defendant Palermo arrived at the store, said nothing to Ms. Keiran, went into her office without asking to use it, and shut the door. Approximately one hour later Defendant Palermo called Ms. Keiran into her office. Defendant Palermo had someone from Loss Prevention on speaker phone. The Loss Prevention representative introduced himself, asked Ms. Keiran a series of questions, and instructed her to write a statement of events. Defendant Palermo handed Ms. Keiran a stack of statement forms which stated she was writing her statement of her own free will and not being coerced by anyone.

43. Ms. Keiran told them she did not want to write a statement at that time. However, Defendant Palermo informed Ms. Keiran that they had a statement from a past employee, N. Bohaker, that was very incriminating; and, if Ms. Keiran refused to write a statement then, they would have no choice but to accept the past employee's statement as truth and Ms. Keiran's job would no longer be secure.

44. Ms. Keiran felt bullied by both Defendant Palermo and the Loss Prevention representative on the phone, and believed she had no choice but to write exactly what they

dictated to her word for word. Ms. Keiran asked multiple times how they expected her to sign that the statement was not coerced when in fact they were telling her exactly what to write and forcing her to do it with the threat of losing her job. The bullying went on for approximately 1-1/2 hours. Ms. Keiran was approximately 7 months pregnant at the time and had been to the hospital multiple times for stress due to harassment from Defendant Palermo. Once the statement was finished, Ms. Keiran was again instructed to write that no one coerced her to write the statement, which she did against her will under threat of job loss.

45. Ms. Keiran had helped two employees pay minor amounts of money on their rental contracts and put $10.00 down for a friend overnight, all out of her own money, which as far as she knew was not against any rule, and believes others had done so.

46. Once the statement was signed, Defendant Palermo instructed Ms. Keiran to step outside of the office while he finished his conversation with Loss Prevention. Ms. Keiran overheard portions of the conversation in which Loss Prevention told Defendant Palermo that it was up to Defendant Palermo how he wanted to handle the situation because there was no real loss to the company. Loss Prevention told Defendant Palermo that he could write Ms. Keiran up or put her on a sort of probation. Defendant Palermo replied, "No. She's done. That's all I needed." Defendant Palermo also called his boss, John, after he got off the phone with Loss Prevention, but Ms. Keiran did not hear the conversation.

47. Defendant Palermo then called Ms. Keiran back into her office and stated, "Corporate is letting you go," and that effective immediately she was fired. Defendant Palermo further lied by stating he could not change the decision. As Defendant Palermo escorted Ms. Keiran out the door, in a laughing voice he stated, "Hey, don't have that baby too early."

48. Ms. Keiran applied for unemployment benefits and was initially denied due to

Defendant RAC using the statement she was forced to write and sign against her will.

49. On or about 06/28/17, Ms. Keiran contacted N. Bohaker, and asked her what she wrote in her statement. Ms. Bohaker told Ms. Keiran she never talked to anyone from Defendant RAC nor had she written a statement. Therefore, Palermo was lying.

50. Ms. Keiran asserts she was discriminated against, harassed, suffered in a hostile environment, and was ultimately wrongfully discharged by Defendants on the basis of her gender, female, and disability/perceived disability, because she was pregnant and required an accommodation. Ms. Keiran was also retaliated against by Defendant Palermo, and ultimately Defendant RAC who did not protect her from the hostile environment, nor protect her job, ultimately terminating Ms. Keiran in retaliation for her complaints of harassment and discrimination.

51. In addition, Defendant Palermo is individually liable to Ms. Keiran for aiding and abetting Defendant RAC in discrimination and for retaliating against Ms. Keiran for reporting his discrimination and harassment, including firing her. Defendant Palermo's behavior is reprehensible, and he should have to pay part of any settlement or judgment out of his personal funds, however, ultimately Defendant RAC is dually responsible for not reining him in.

52. Defendant RAC is responsible for all of the actions of Defendant Palermo, on the basis of strict liability and/or under the theories of *respondeat superior* and vicarious liability.

53. Defendants knew, or should have known, that the actions described herein, discrimination, harassment and retaliation were illegal. Defendants' actions were contrary to the law and done knowingly, maliciously, with reckless indifference and were egregious and wanton, thus justifying an award of enhanced liberal compensatory damages.

54. Defendants' discrimination/harassment and retaliation against Ms. Keiran has

caused her damages, including but not limited to emotional distress, embarrassment, humiliation, loss of her job, lost wages and benefits, anxiety, fear, loss of sleep, complications with her medical condition and causing additional medical treatment, and to suffer other ongoing physical and emotional symptoms.

55. Ms. Keiran claims all damages allowed to her by law, including but not limited to liberal/enhanced compensatory and punitive damages, lost wages and benefits (past and future), damages for emotional distress, embarrassment, humiliation, aggravation, anxiety, loss of sleep, loss of reputation and other ongoing physical and emotional symptoms, attorney fees, costs, all pre-judgment and post-judgement interest, and an amount to compensate for any negative tax consequences that results from any judgment or decision.

56. Ms. Keiran also requests all equitable relief to which she may be entitled, including but not limited to reinstatement, an apology, and appropriate discipline of Defendant Palermo up to and including his termination.

## COUNT I
## GENDER/PREGNANCY DISCRIMINATION AND
## HOSTILE ENVIRONMENT/HARASSMENT
## NH RSA 354-A, et seq.
## TITLE VII -42 U.S.C. §2000e, et seq.
## DEFENDANT RAC

57. Ms. Keiran incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein and further states as follows:

58. The actions of which Ms. Keiran complains herein constitute gender/pregnancy discrimination, hostile environment/harassment, and termination, all contrary to NH RSA 354-A, et seq. and Title VII.

59. The discrimination which Ms. Keiran suffered was severe and/or pervasive, including but not limited to Defendants refusing to accommodate her reduced hours per her

doctor's note; yelling and screaming at her; threatening to demote her and cut her pay due to reduced hours; failing to finish training her due to her reduced hours and being pregnant; placing her on forced maternity leave; attempting to dock her pay due for reduced hours; falsifying Ms. Keiran's personnel records in an attempt to fire her; forcing Ms. Keiran to sign a written statement against her will and under duress, such that no reasonable person would be expected to endure same, and then actually firing her.

60. Said hostile environment/harassment continued during the term of Ms. Keiran's employment with Defendant RAC despite her complaints and no real investigation was completed.

61. Ms. Keiran asserts that the treatment she received as described herein was because of her gender, female, and because she was pregnant and required a temporary accommodation for the duration of her medical treatment.

62. As a result, Ms. Keiran has suffered the damages as alleged herein, and claims all damages as allowed by law, and all equitable relief to which she is entitled.

**COUNT II**
**RETALIATION**
**NH RSA 354-A, et. seq.**
**TITLE VII - 42 U.S.C. §2000e, et seq. and**
**The ADA/ADAAA**
**BOTH DEFENDANTS**

63. Ms. Keiran incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

64. As set forth above, Ms. Keiran was retaliated against by Defendants for her complaints of harassment and gender discrimination/retaliation and failure to accommodate her medical needs and her reports to corporate about same. This also constitutes pregnancy discrimination based on gender, all of which is contrary to NH RSA 354-A, et. seq. and Title

VII. (Title VII and the ADA/ADAAA apply only to Defendant RAC.)

65. As a result, Ms. Keiran has suffered the damages as alleged herein, and claims all damages as allowed by law, and all equitable relief to which she is entitled.

## COUNT III
## DISABILITY DISCRIMINATION/FAILURE TO ACCOMMODATE
## AND HARASSMENT/HOSTILE ENVIRONMENT
## NH RSA 354-A, et seq.
## ADA/ADAAA, 42 USC §12101, et seq., as amended
## DEFENDANT RAC

66. Ms. Keiran incorporates herein each and every allegation elsewhere in the Complaint as if fully set forth herein, and further states as follows:

67. Ms. Keiran was a qualified person with a temporary disability who was entitled to a reasonable accommodation.

68. Towards the end of her pregnancy, Ms. Keiran was required by her doctor to work no more than 6 hours per day for a total of 30 hours per week.

69. Ms. Keiran repeatedly requested this reasonable accommodation, which although corporate HR agreed, her direct supervisor repeatedly rejected and failed to provide, to the detriment of her and her unborn child.

70. Said failure to provide the reasonable accommodation, and harassing and retaliating against her due to her requests, constitutes discrimination, which is contrary to NH RSA 354-A, et. seq. and the ADA/ADAAA. (The ADA claim applies only to Defendant RAC.)

71. Said treatment caused Ms. Keiran to suffer a hostile environment based on pregnancy, a temporary disability, that no reasonable person would be expected to endure, and in fact she was terminated.

72. As a result, Ms. Keiran has suffered the damages as alleged herein, and claims all damages as allowed by law, and all equitable relief to which she is entitled.

# COUNT IV
## AIDING AND ABETTING UNLAWFUL DISCRIMINATORY PRACTICES INCLUDING FAILURE TO ACCOMMODATE/DISABILITY, AND GENDER/PREGNANCY
## IN VIOLATION OF NH RSA 354-A, et. seq.
## DEFENDANT PALERMO

73. The paragraphs stated elsewhere in this complaint are incorporated herein by reference as if fully set forth herein, particularly Counts I and III above, and Plaintiff further states as follows:

74. Defendant Palermo retaliated against Ms. Keiran for reporting his discrimination and harassment, including further harassing her and ultimately firing her, because of her pregnancy/gender and temporary disability.

75. By harassing and discriminating against Ms. Keiran, Defendant Palermo aided and abetted unlawful employment practices of Defendant RAC, in violation of RSA 354-A, et. seq., particularly contrary to RSA 354-A:2 (XV)(d). See also the New Hampshire Supreme Court's decision in *U.S. Equal Empl. Opportunity Commn. v. Fred Fuller Oil Co., Inc*., 168 N.H. 606 (2016).

76. As a result, Ms. Keiran has suffered damages as alleged elsewhere herein, and claims all damages as allowed by law, and all equitable relief to which she is entitled.

WHEREFORE, Ms. Keiran prays that the Honorable Court order:

A. Back wages, together with lost fringe benefits and any other benefits, including increased retirement benefits, which Ms. Keiran would have earned had she not been terminated;

B. Future wages, fringe benefits, loss of earning capacity and other benefits;

C. Reasonable attorneys' fees, interest and costs;

D. Enhanced compensatory damages, liquidated damages and double damages;

E. Liberal/enhanced compensatory damages;

F. Punitive damages;

G. Reinstatement;

H. An amount to be awarded by the Court to make up for any adverse tax consequences due to any judgment or award;

I. All available pre-judgment and post-judgment interest;

J. All other damages as set forth herein and/or as allowed by law;

K. All equitable relief which may be available; and

L. Such other and further relief as may be deemed just and proper.

    Respectfully submitted,

    **JULIE KEIRAN, Plaintiff**
    By her attorney


Dated: January 31, 2020        /s/ LESLIE H. JOHNSON
    Leslie H. Johnson, Esquire – NHBA #5545
    Law Office of Leslie H. Johnson, PLLC
    PO Box 265
    Center Sandwich, NH 03227
    603.284.6600
    leslie@lesliejohnsonlaw.com